1997 SD 99

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Jason BOYLES, Defendant and Appellant.**

No. 19783.

Supreme Court of South Dakota.

Argued April 29, 1997.

Decided Aug. 6, 1997.

Mark Barnett, Atty. Gen., Sherri Sundem Wald, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Stanley E. Whiting of Whiting Law Office, Winner, for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] Jason Boyles was convicted of second degree murder for a hit and run homicide. After trial, three jurors said they thought the killing was accidental and expressed confusion over the court's instructions. Boyles then sought to question all the jurors under oath. May a verdict be impeached by calling jurors to testify they misunderstood or misapplied the court's instructions? Jurors cannot testify about their mental processes in deliberations. We therefore affirm the conviction and sentence.

### Facts

[¶ 2.] In the early morning of August 10, 1995, while walking along the road south of White River, Ronald Stranger Horse was

struck from behind by a car and killed instantly. Shortly afterwards in nearby Swift Bear community, Gloria Moran saw a red vehicle pass her house and noted damage to the front windshield on the passenger side, the top of the car, and the back window. She knew the car belonged to John Boyles, Jason Boyles' father. When the car came to a sudden stop, she saw Harvi Lynn Sharp Butte exit the passenger door. Gloria walked outside. Sharp Butte approached her, looking scared. Gloria asked who was driving the car. Sharp Butte replied, "Jason Boyles." As the car drove away, Sharp Butte asked Gloria to call law enforcement because Boyles had just run over a man out on the highway. She told Gloria not to mention her name. Gloria noticed Sharp Butte had "real fine" splinters of glass on her forehead and legs with "little bitty" cuts. Sharp Butte brushed off the glass fragments and asked Gloria if she could use her bathroom to rinse the glass from her mouth.

[¶ 3.] Brian Hart, who lived near the White River ASCS office, was awakened by a car horn and an engine revving, and looked outside to see a red car with its windshield "all bashed out." He noticed the driver was one of the "Boyles boys." Shortly, two law enforcement officers received complaint calls. Hart telephoned Mellette County Deputy Sheriff Mike Blom about 6:55 a.m. to report that a red car was spinning around in his neighborhood. Gloria Moran called White River Police Chief Joe Krogman about a possible hit-and-run south of town. When Dave Steffen arrived at the ASCS office, he saw Boyles standing near a noticeably damaged red car. Boyles appeared to have one or two recent cuts or scratches on his left forearm and was obviously intoxicated. "What's your name?" Steffen asked. "Jason," Boyles replied. "Who did this?" Steffen said. Boyles responded, "Those guys did." He pointed at the car, but no one was in it. Boyles then uttered something to the effect, "Oh man, I'm in trouble now." Krog-

man arrived and arrested him. During a pat down, he found the keys to the car in Boyles' pocket. Later both Krogman and Steffen would recall seeing no glass particles on Boyles' person.

[¶ 4.] With Boyles in the backseat of the patrol car, Krogman headed south on Highway 83 to investigate the alleged hit-and-run. He found Stranger Horse's lifeless body in a ditch. Believing the case was subject to federal jurisdiction, the FBI and tribal authorities were notified. Fred Bennett, an officer with the Rosebud Sioux Tribe Law Enforcement Service, met Krogman and Boyles at the scene.[1] Bennett took custody of Boyles and advised him of the *Miranda* warnings. Boyles responded, "I didn't mean to do it. I didn't mean to do it." A later blood test revealed a blood alcohol level of .262 percent.[2] After the jurisdiction question was resolved, Boyles was charged in Mellette County with first degree murder in violation of SDCL 22–16–4.

[¶ 5.] Sharp Butte first told an FBI investigator that she, Boyles and others had been drinking alcohol and driving around White River together the night before the incident, but because she got into a fight with her sister at Horse Creek, four miles south of White River, she decided to walk back alone. As she walked, she said Boyles drove past her and ran down Stranger Horse; then he stopped, ordered her to get in, and later dropped her off at Swift Bear. The investigator challenged Sharp Butte's story when he observed her red, irritated legs and upper arms. Soon she admitted to lying, disclosing she had been in the car when Boyles hit Stranger Horse. She then recounted how she and Boyles, after passing Stranger Horse who was walking south in the opposite direction, discussed giving him a ride. Boyles decided against it. He turned the car around, veered onto the side of the road toward Stranger Horse as he increased speed, and said, "Well, watch this." She

---

1. A land survey later confirmed the incident occurred on deeded land in Mellette County, subjecting the matter to State jurisdiction.

2. An extrapolation of the results back to the approximate time of the incident resulted in a BAC of .285 percent.

reached for the steering wheel to redirect the car, but Boyles pushed her hand away. When the car struck him, Stranger Horse bounded off the hood, hit the windshield on the passenger side, and glanced off the top of the car. Sharp Butte said Boyles "just smiled and like chuckled a little bit." Frightened, she repeatedly told Boyles to take her home. He drove to Swift Bear, and Sharp Butte jumped out near the Moran home. When she told Boyles she was going home, he threatened to run her over, too. She had never seen him behave this way before.

[¶ 6.] Boyles' version was quite different both in content and method of revelation. He could not testify about the incident, as he had no conscious recollection due to an alcoholic blackout. To prepare his defense, therefore, he was hypnotized by Dr. Matt Stricherz of the University of South Dakota. Under hypnosis, Boyles recounted the incident, but once "out of trance" had no memory of the statements he made while hypnotized. Thus he was effectively "unavailable to testify." SDCL 19–16–29 (Fed.R.Evid. 804(a)(3)). Stricherz was allowed to report at trial Boyles' hypnotically elicited rendition.[3] He testified Boyles said Sharp Butte was driving when Stranger Horse was struck. Boyles had stopped the car to urinate, and while outside, Sharp Butte took the wheel and refused to let him drive. It was she who said, "Watch this," as she swerved onto the shoulder and hit Stranger Horse. Boyles described how as a passenger, glass flew all over him from the impact on the windshield. According to Boyles, Sharp Butte then became scared and let him drive.

[¶ 7.] Investigators found no skid marks on the road, signifying the car made no detectable avoidance maneuvers before Stranger Horse was hit. The only marks found were those made by the body, which an investigator believed landed in the ditch at forty-four miles per hour. Based on these measurements, it was estimated the car was traveling at approximately sixty to sixty-five miles per hour when it hit Stranger Horse. A glass analyst determined that because the body impacted on the right side of the windshield, the person in the passenger's seat would have been hit with most of the shattered glass.

[¶ 8.] In June 1996, a Mellette County jury found Boyles not guilty of first degree murder, but guilty of second degree murder.[4] About a week after trial, a juror happened to comment about the verdict to someone in a Winner, South Dakota, law office. An attorney who overheard the remarks, Theresa M. Maule, later submitted an affidavit reporting she could not remember the conversation verbatim, but recalled the juror said:

> [W]hen they were debating the issue everyone knew that it was an accident and that [defendant] certainly did not mean to kill the other person. However, they had a hard time deciding what to sentence him to. Since they knew it was not murder they settled for manslaughter. At the time she did not know it was a life sentence without parole and she and the other jurors did not understand that he would be spending life in prison.

Sworn statements were then obtained from three jurors: F.M., A.C. and L.K. Each signed nearly identical affidavits stating:

> [T]here were several jurors [one affidavit stated "4 jurors"], myself included, who were of the opinion that the incident in question was an accident. That no juror orally expressed an opinion claiming the incident was anything but an accident. The jury was unsure as to the meaning of several words and phrases contained in the instructions ... [specifically] the meaning of the phrase "evincing a depraved mind, regardless of human life." The definition reached by the jury was that "evincing a depraved mind," meant being in an altered state of mind, such as being intoxicated. The jury concluded that since [Boyles] was operating a motor vehicle while in an al-

---

3. The legality of admitting Boyles' hypnotically-aided version of events is not an issue on appeal.

4. Two trials occurred in this matter. The first ended with a hung jury in March, 1996.

tered state of mind, [he] automatically "evinced a depraved mind, regardless of human life."

[¶ 9.] Two other jurors, J.L. and R.S., notified the trial court they were "concerned about contacts with jurors by the defense, and ... asked [the judge] to do something." The court granted the prosecutor's motion to prohibit counsel from talking to more jurors. Based upon the information imparted in these affidavits, Boyles filed motions to allow post-trial *voir diré* of each juror, for judgment notwithstanding the verdict, and for a new trial. All motions were denied, and he was sentenced to mandatory life in prison. Boyles appeals, contending he should have been permitted to examine the jurors, and the trial court abused its discretion when it allowed the jury to view the damaged windshield because it had deteriorated while sitting outside unprotected.

### Analysis and Decision

[¶ 10.] **1. Impeachment of Jury Verdict under Rule 606(b)**

■ [¶ 11.] During deliberations, several jurors, possibly four, expressed the opinion Boyles hit Stranger Horse by accident. Under SDCL 22–16–7, "Homicide is murder in the second degree when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." Boyles contends a finding he accidentally hit Stranger· Horse negates the "depraved mind" element necessary for a second degree murder conviction. SDCL 19–14–7 (Fed.R.Evid. 606(b)) provides the standard for challenges to a jury's verdict based on irregularities during deliberations:

> Except as otherwise provided by statute, upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concern-

ing his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

[¶ 12.] Eight decades ago the United States Supreme Court warned "it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases...." *McDonald v. Pless*, 238 U.S. 264, 268–69, 35 S.Ct. 783, 785, 59 L.Ed. 1300, 1302–03 (1915) (citations omitted). Recognizing these concerns, Rule 606(b) permits juror testimony about extraneous prejudicial information or outside influences. *Uhlir v. Webb*, 1996 SD 5, ¶ 15, 541 N.W.2d 738, 740; *State v. Wilkins*, 536 N.W.2d 97, 99 (S.D.1995); *State v. Holloway*, 482 N.W.2d 306, 310 (S.D.1992); *Shamburger v. Behrens*, 418 N.W.2d 299, 303 (S.D.1988); *State v. Luna*, 378 N.W.2d 229, 236 (S.D. 1985); *Buchholz v. State*, 366 N.W.2d 834, 838 (S.D.1985); *State v. Finney*, 337 N.W.2d 167, 169 (S.D.1983). The difference between extraneous and intrinsic information was explained in *Wilkins*. Intrinsic information, about which testimony is prohibited, involves "(1) the effect such extraneous information had upon their minds; (2) statements or discussions which took place during deliberations; or (3) evidence of 'intimidation or harassment of one juror by another, or other intra-jury influences.'" 536 N.W.2d at 99 (citation omitted). Extrinsic information may include "media publicity, conversations between jurors and non-jurors, and evidence not admitted by the court." *Id.; see* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* § 606.04 (2ded 1997)(noting 606(b) was drafted to bar jurors from testifying on motives, methods, or mental processes used in

reaching a verdict); D.R. Rimmer, Annotation, *Competency of Juror as Witness, Under Rule 606(b) of Federal Rules of Evidence, Upon Inquiry Into Validity of Verdict or Indictment,* 65 ALR Fed. 835 (1983 & 1996 Supp.)(collecting cases).

[¶ 13.] Boyles seeks to probe the jurors' thoughts and discussions, as well as their understanding of the court's instructions. Clearly, this falls within the category of unreachable intrinsic information. We specifically discussed juror understanding of instructions in *State v. Gallegos*:

> The jury's understanding of the trial court's instructions and charge is a matter that inheres in the verdict and cannot be classified as extraneous prejudicial information which was improperly called to the jury's attention. After a jury has been discharged, the testimony of a juror may not be received to impeach a jury verdict on grounds which inhere in the verdict itself.

316 N.W.2d 634, 638 (S.D.1982) (citations omitted). Whether the jury thought "depraved mind" included a mind altered by alcohol inheres in the verdict and cannot be later explored. During deliberations the jury asked for a dictionary, a request the court denied. While the affidavits are silent on the point, Boyles supposes this request was generated by confusion about the definition of "depraved." True or false, inquiring into this also impinges upon the deliberation process.

[¶ 14.] Unrestrained intrusions into jury deliberations would erode our system of justice and debase the stability of verdicts:

> "There is little doubt that post-verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict seriously disrupt the finality of the pro-

cess." *Shamburger,* 418 N.W.2d at 304 (quoting *Tanner v. United States,* 483 U.S. 107, 120, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90, 106 (1987)).

*Uhlir,* 1996 SD 5, ¶ 17, 541 N.W.2d at 741. As Justice Robert Jackson wrote in *Stein v. New York,* 346 U.S. 156, 178, 73 S.Ct. 1077, 1089–90, 97 L.Ed. 1522, 1539 (1953), courts disfavor:

> any public or private post-trial inquisition of jurors as to how they reasoned, lest it operate to intimidate, beset and harass them. This Court will not accept their own disclosure of forbidden quotient verdicts in damage cases. *McDonald v. Pless,* 238 U.S. 264 [35 S.Ct. 783, 59 L.Ed. 1300]. Nor of compromise in a criminal case whereby some jurors exchanged their convictions on one issue in return for concession by other jurors on another issue. *Hyde v. United States,* 225 U.S. 347 [32 S.Ct. 793, 56 L.Ed. 1114 (1912)]. "If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *McDonald v. Pless, supra,* at 267–268 [35 S.Ct. at 784, 59 L.Ed. at 1302].

[¶ 15.] For jurors to doubt themselves after rendering a hard decision is not altogether uncommon, especially when later approached by those for whom the result was bitterly adverse. Courage and collegiality mustered in the jury room may not invariably persist after dispersal. For some, doubts and misgivings are inevitable. Yet it is always a jury's collective judgment we look to, not the singular reflections of particular members. Allowing individual jurors to impugn a verdict strikes at the core of our jury system. "The best justification of the rule is not that it protects a process that is somehow irrational, erratic, or shameful, but that it protects a good system that cannot be made perfect...." Christopher B. Mueller and Laird C. Kirkpatrick, 3 *Federal Evidence* § 247, at 55 (2ded 1994). Of course, these uncertainties are disturbing, but the alternative may be more so:

The rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

\* \* \* \* \* \*

For, while it may often exclude the only possible evidence of misconduct, a change in the rule "would open the door to the most pernicious arts and tampering with jurors." "The practice would be replete with dangerous consequences." "It would lead to the grossest fraud and abuse" and "no verdict would be safe." (Citations omitted.)

*McDonald*, 238 U.S. at 267–68, 35 S.Ct. at 784–85, 59 L.Ed. at 1302.

[¶ 16.] This issue has arisen repeatedly, and courts have uniformly held that even serious misunderstandings during deliberations will not justify calling jurors to testify in an effort to set aside a guilty verdict. *See, e.g., United States v. Sjeklocha*, 843 F.2d 485, 488 (11th Cir.1988)(order for new trial reversed; juror statement about deliberations cannot impeach verdict); *United States v. Miller*, 806 F.2d 223, 225 (10th Cir.1986)(juror said she may have misunderstood instructions; testimony not allowed); *United States v. Schwartz*, 787 F.2d 257, 261 (7th Cir.1986)(jurors' factual misperceptions in deliberations cannot impeach verdict); *United States v. Barber*, 668 F.2d 778, 786–87 (4th Cir.1982)(juror later not sure accused "should have been called guilty the way that he was"; refusal to permit post-verdict juror interview upheld), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982); *United States v. D'Angelo*, 598 F.2d 1002, 1003–05 (5th Cir.1979)(note from jury suggested it misunderstood or misapplied instructions); *United States v. Vannelli*, 595 F.2d 402, 407

(8th Cir.1979)(days after verdict, juror said she made wrong decision; new trial motion denied); *United States v. Gerardi*, 586 F.2d 896, 898 (1st Cir.1978)(two days after verdict, juror told judge he thought he made a mistake in voting guilty; verdict held not impeachable); *United States v. Lustig*, 555 F.2d 737, 746 (9th Cir.1977)(juror affidavit denying verdict not held to require reversal) *cert. denied*, 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977); *United States v. Crosby*, 294 F.2d 928, 949 (2d Cir.1961)(juror cannot testify about improperly considering guilty plea of codefendant); *Klimes v. United States*, 263 F.2d 273, 274 (D.C.Cir.1959)(juror affidavit indicating no abiding conviction of guilt cannot be used to impeach verdict); *United States v. Camacho*, 865 F.Supp. 1527, 1531–33 (S.D.Fla.1994)(allegations by two jurors that verdict was result of compromise and belief verdict would be reversed on appeal; motion to interview jury members denied); *United States v. Homer*, 411 F.Supp. 972, 978 (W.D.Pa.1976)(proof not admissible that jury did not hear verdict had to be unanimous).

[¶ 17.] Before they were discharged, all twelve jurors were individually polled: each one agreed second degree murder was the correct verdict. SDCL 23A–26–10 (Fed. R.Evid. 31(d)). *See United States v. Weiner*, 578 F.2d 757, 764 (9th Cir.1978)(in deliberations, juror voted guilty "with reservations," but did not mention this in jury poll; new trial motion properly denied); *United States v. Chereton*, 309 F.2d 197, 200–01 (6th Cir. 1962)(claim jurors meant to convict on different counts; testimony not permissible as poll at end of trial showed no confusion). Compare cases in which jurors expressed misgivings during a jury poll: *United States v. McCoy*, 429 F.2d 739, 742 (D.C.Cir.1970)(juror answered, "Yes, with a question mark;" as jury was not sent back to further deliberate, conviction was reversed); *People v. Superior Court of Orange County*, 67 Cal.2d 929, 64 Cal.Rptr. 327, 328–29, 434 P.2d 623, 624–25 (1967)(mistrial proper when juror answered he "didn't vote" on the verdict but "went with the majority"); *People v. Booker*,

208 Mich.App. 163, 527 N.W.2d 42, 46 (1994)(manslaughter conviction reversed where foreperson said in jury poll he reluctantly acquiesced in verdict); *Solar v. United States*, 86 A.2d 538, 540–41 (D.C.Mun.App.1952)(juror replied, "Guilty, I suppose"; new trial ordered); *State v. Brown*, 110 Ohio App. 57, 168 N.E.2d 419, 422 (1953)(conviction reversed where juror responded, "I went with the rest because I was the only one left").

[¶ 18.] Our rules make it abundantly clear this jury cannot be interrogated about its deliberations. How can we reconcile the seeming injustice of a man in prison for the rest of his life when three jurors, perhaps more, think they misunderstood the law? First, the trial court's instructions correctly defined the term these jurors expressed confusion about: "evincing a depraved mind, regardless of human life, means conduct which endangers the safety of another and demonstrates an utter lack of concern for the life and safety of another and for which there is no justification."[5] Second, the jury apparently believed Sharp Butte, the only eyewitness to the murder. Boyles' conviction rests heavily upon her word. He emphasizes Sharp Butte's poor credibility in her community, a fact the State never rebutted. Indeed, she lied when first questioned about the incident. Nor was she unwilling to use violence, especially when drinking. Ear-

lier in the evening she had been in a vicious fight with her sister. Yet a witness's trustworthiness is a question for the jury, and the jury obviously concluded Sharp Butte was truthful when she said Boyles was driving. So how can the remainder of her testimony that he also intentionally ran down Stranger Horse be discounted? On appeal, we are bound to view the evidence in a light most favorable to the verdict. *State v. Schmiedt*, 525 N.W.2d 253, 254–55 (S.D.1994); *State v. Miskimins*, 435 N.W.2d 217, 222 (S.D.1989). Third, only Boyles was seen behind the wheel that morning; no glass was found on him; Sharp Butte had glass particles on her person and her arms and legs were red and irritated, presumably from the glass, consistent with where she claimed to have been sitting; no skid marks were found suggesting any attempt to avoid hitting the victim; and Boyles made incriminating statements to more than one person. Perhaps it would be a different matter if the proof scarcely supported the outcome. This verdict fits the evidence the State offered, however, despite any supposed confusion over the court's instructions. We find no error in refusing Boyles' motions to examine the jurors, for judgment n.o.v., and for a new trial.[6]

[¶ 19.] **2. Jury View of Broken Windshield**

[¶ 20.] Boyles asserts error in the court allowing the jury to examine the windshield

**5.** A possible genesis for the "accident" theory comes from Boyles' hypnotically-induced version in which he said that at the last moment Sharp Butte swerved to avoid hitting Stranger Horse, but it was too late. Perhaps the jury reasoned Boyles was really talking about himself. Even if we accept the notion that at the last moment Boyles tried to avoid Stranger Horse, it would not necessarily disprove second degree murder, especially if when saying "watch this" his intent was to create a near miss. That would still denote "utter lack for concern for the life and safety of another."

**6.** Boyles also argues his inability to poll the jury constituted violations of his due process and jury trial rights, citing *Young v. United States*, 163 F.2d 187 (10th Cir. 1947). In that case, the court wrote "jurors are competent witnesses for the purpose of showing that through oversight, inadvertence, or mistake respecting the substance of the verdict returned into court, is [sic] was not the verdict on which agreement was actually reached in the jury room." 163 F.2d at

189. Here, the jury was given five options on the verdict form, from guilty of first degree murder to not guilty of any charge. They chose "not guilty of first degree murder, but guilty of second degree murder." There is no suggestion that they checked the wrong option by mistake or inadvertence. We note, also, the *Young* court's holding rests on the quote preceding the above-cited portion:

The rule to which reference has been made excluding testimony or affidavits of jurors to impeach the verdict for misconduct of members of the jury occurring within the jury room and in connection with the deliberations of the jury does not prevent the reception of evidence of jurors to show that through mistake, the real verdict on which agreement was reached in the jury room was not correctly expressed in the verdict returned into open court. Jurors cannot be heard to testify that while the substance of the verdict returned into court was understood, it was predicated upon a mistake of the testimony, a misrepresentation of the law, unsound reasons, or improper motives.

ten months after the incident, distorting the reality and significance of the amount of glass seen on Sharp Butte. By the time the jury view occurred, the windshield had fallen into the passenger seat. SDCL 15–14–16 provides:

> When in the opinion of the court it is proper for the jury to have a view of the property which is the subject of litigation, or of the place in which any material fact occurred, it may order them to be conducted in a body, under the charge of an officer, to the place which shall be shown to them by some person appointed by the court for that purpose. The jury may be given a view of the property or place while the case is being submitted to them or during their deliberation, or both, as the court may order. While the jury are thus absent, no person, other than the person so appointed, shall speak to them on any subject connected with the trial.

We review this decision under the abuse of discretion standard. *City of Sioux Falls v. Kelley*, 513 N.W.2d 97, 109 (S.D.1994); *Bean v. Best*, 77 S.D. 433, 93 N.W.2d 403 (1958).

[¶ 21.] While it is true the windshield was in a deteriorated condition when the jury viewed it, several photographs showing its condition immediately after the incident were also admitted into evidence. Furthermore, an FBI expert testified on directional impact analysis in relation to the course Stranger Horse's body took when it was hit. He concluded the person who was in the passenger seat would have been largely covered with glass, certainly more than the driver. Gloria Moran confirmed the presence of tiny shards of glass on Sharp Butte after she got out of the car. Seeing the fallen windshield could not have misled the jurors because they also saw the photos depicting it immediately after the incident. Considered as a whole, these circumstances present no abuse of discretion. *Kelley, supra.*

[¶ 22.] Affirmed.

[¶ 23.] MILLER, C.J., and SABERS, AMUNDSON, and GILBERTSON, JJ., concur.

---

*Id. Young* set out the well-grounded rule we, and other courts, consistently follow, that "ordinarily jurors in the United States Courts will not be heard to give testimony, either oral or by affidavit, for the purpose of impeaching the verdict returned where the facts sought to be shown are such that they essentially inhere in the verdict." *Id.* at 188 (citing cases). Further, the United States Supreme Court has held that the inability to question jurors about a verdict does not violate a defendant's Sixth Amendment "interest in an unimpaired jury," as many other aspects of the trial process protect that interest. *Tanner v. United States*, 483 U.S. 107, 127, 107 S.Ct. 2739, 2751, 97 L.Ed.2d 90, 110 (1987).

> The suitability of an individual for the responsibility of jury service, of course, is examined during *voir dire*. Moreover, during the trial the jury is observable by the court, by counsel, and by court personnel. Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict.

*Id.* (citations omitted). Therefore, we find these violation of due process assertions to be without merit. Similarly unpersuasive is the argument defendant's mandatory life sentence constitutes cruel and unusual punishment. We have held in the past that such is not the case, as it is mandated by legislative enactment. SDCL 22–16–12 (classifying second degree murder as a Class B felony); SDCL 22–6–1 (setting the punishment for a Class B felony as life imprisonment); *State v. Primeaux*, 328 N.W.2d 256, 259 (S.D.1982)(mandatory life sentence without parole "for crimes constituting second-degree murder" not "so cruel and unusual as to shock the conscience of the court").