NOT DESIGNATED FOR PUBLICATION

No. 117,263

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TRAVIS P. ODOM,
*Appellant*.


MEMORANDUM OPINION

Appeal from Cherokee District Court; OLIVER KENT LYNCH, judge. Opinion filed April 20, 2018. Convictions affirmed, sentences vacated, and remanded with directions.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, *Amanda G. Voth*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before LEBEN, P.J., GARDNER, J., and BURGESS, S.J.


PER CURIAM: Travis Odom appeals his convictions for rape and aggravated indecent liberties with a child in Cherokee County District Court. Odom contends that the district court deprived him of his right to due process by not recalling the jury to investigate allegations of juror misconduct. He also claims that the district court erred in sentencing him to lifetime postrelease supervision. This case is affirmed in part, reversed in part, and remanded with directions.

FACTUAL AND PROCEDURAL BACKGROUND

Though Odom's brief provides a limited sketch of the underlying facts, the circumstances prompting the State to charge Odom with four counts of rape and one count of aggravated indecent liberties with a child are immaterial for purposes of resolving Odom's issues on appeal. This court need only to address the procedural history of the case to provide a background for the legal challenges Odom raises on appeal.

The State originally charged Odom with three counts each of rape and aggravated indecent liberties with a child but later amended the charges to four counts of rape and two counts of aggravated indecent liberties with a child. The State then voluntarily moved to dismiss without prejudice one of the counts of aggravated indecent liberties with a child, which the district court granted. Following a four-day jury trial, beginning on September 9, 2014, the State again amended the charges to conform to the evidence presented at trial. The amendment did not change the number or types of charges against Odom.

The jury convicted Odom of all five remaining counts. Odom requested a poll of the jury, and each juror affirmed that the verdicts reflected the way that he or she concluded the case should be decided.

Several months after trial but before sentencing, Odom filed a letter with the district court generally alleging ineffective assistance of counsel but also indicating that the jury was not impartial because some unidentified jurors had expressed set opinions regarding his case. Odom's counsel followed up this letter with a motion for judgment of acquittal or new trial, alleging among other things that certain jurors failed to follow the instructions given by the court and failed to decide the case on the evidence.

"In support of this motion, [Odom] states:

. . . .

"4. In post trial communications with jurors, they indicated they did not believe any of the testimony of the alleged victim.

"5. Jurors indicated the only testimony believed was that of Defendant's son, who testified nothing happened.

"6. Jurors indicated that based on the belief of the testimony of Defendant's son, there was not proof beyond a reasonable doubt to convict Defendant of the charges in the case.

"7. Jurors stated they found Defendant guilty because 'he did not molest the little girl, but he was guilty of something and we should err on the [*sic*] caution.'

"8. This decision was based on multiple statements from jurors who said 'you know he did something or he would not be here.'

"9. The finding of the jury is not the standard required in a criminal jury trial and is not consistent with the instructions given to this jury."

On March 30, 2015, the district court held a nonevidentiary hearing on Odom's motion. After both sides had presented arguments, the district court requested clarification about the number of jurors at issue. The response of Odom's counsel was not entirely clear. He indicated that all of the information contained in the motion came from one juror but that the quoted material reflected comments by another male juror to the reporting juror. It is unclear whether the unquoted material represented views expressed by more than one juror. However, Odom's appellate brief indicates that the statements regarding the relative credibility of the victim and Odom's son were the views of a particular juror, R.S. Odom's brief clarified that the quoted statements were made by another, unidentified male juror. The district court ordered Odom's counsel to submit the name of this unidentified juror in a pleading filed with the court under seal.

The following day, the district court issued a letter decision. After noting that defense counsel did not disclose the name of the juror as directed, the court denied the motion for judgment of acquittal/new trial, essentially adopting the State's response to the

3

motion for judgment of acquittal/new trial. The district court further directed the State to prepare a journal entry. The record does not contain a separate journal entry on the ruling, but the order was journalized in the district court's journal entry of sentencing.

At sentencing on December 5, 2016, the district court imposed life imprisonment without the possibility of parole for 25 years (the hard 25) for each of Odom's five convictions. The district court ran two of the rape convictions consecutively for a controlling term of life imprisonment without possibility of parole for 50 years. For each of the five convictions, the court also imposed lifetime postrelease supervision.

Odom filed a timely notice of appeal from sentencing.

DID THE DISTRICT COURT ABUSE ITS DISCRETION IN REFUSING TO RECALL THE JURY TO INVESTIGATE ALLEGATIONS OF JUROR MISCONDUCT?

Odom first contends that the district court improperly denied his request to recall the jury to question jurors about improper comments during deliberations. These comments allegedly indicated that certain jurors ignored the district court's instructions to decide the case on the evidence and the law. Odom claims he was found guilty not for what he was charged with doing in this case but for some unspecified wrongdoing that he likely committed.

Appellate review of a district court's decision on a request to recall the jury is limited to an abuse of discretion. *State v. Smith-Parker*, 301 Kan. 132, 165, 340 P.3d 485 (2014) (citing *State v. Jenkins*, 269 Kan. 334, 338, 2 P.3d 769 [2000]). Judicial discretion is abused when the action taken by the district court is based upon an erroneous legal decision, is based upon findings of fact which are unsupported by the evidence, or is otherwise unreasonable. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). In the context of denying a motion to recall a jury, a district court abuses its discretion if the

4

court fails to articulate its reasons for its decision. *Smith-Parker*, 301 Kan. at 165 (citing *State v. Kirkpatrick*, 286 Kan. 329, 351, 184 P.3d 247 [2008], *overruled on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 [2013]).

Odom did not present a formal, written request to recall the jury. In his motion for judgment of acquittal/new trial, he argued the alleged juror misconduct as a basis for acquittal or new trial. However, at the hearing on his motion, Odom's counsel clearly sought a recall of the jury. In denying the request for a recall, the district court essentially relied on the reasoning provided by the State's response, but also noted that Odom had not submitted the name of the other juror under seal as directed by the court. The State's response generally argued that recalling the jury was inappropriate since the allegations of misconduct impinged upon the thought processes of particular jurors during deliberation.

> "A juror may be called to testify at a hearing on a posttrial motion only if the court—after a hearing to determine whether all or any jurors should be called—grants a motion to call the juror. If a juror is called, informal means should be used to obtain the juror's attendance at the hearing, rather than subpoena." Kansas Supreme Court Rule 181 (2018 Kan. S. Ct. R. 223).

A recall of one or more jurors after a verdict has been rendered is undertaken only for cause, and the burden is on the party requesting recall to demonstrate the necessity of a recall. *Smith-Parker*, 301 Kan. at 166 (citing *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842 [1987]). Generally speaking, a district court should recall the jury if the court is unable to determine that the evidence in favor of the prevailing party, in this case the State, is substantial or that the jury misconduct did not relate to a material issue. See *Smith-Parker*, 301 Kan. at 166 (citing *Saucedo v. Winger*, 252 Kan. 718, Syl. ¶ 3, 850 P.2d 908 [1993]). Arguably, the State cannot satisfy either of these exceptions. Nevertheless, a district court's inquiry upon recall is necessarily limited.

5

Under English common law, a jury verdict could not be impeached by a jury. The rule, commonly known as the Mansfield rule, prohibited jurors from testifying about subjective mental processes or about events occurring during deliberations. The no-impeachment rule was adopted in the United States with some modification. Some jurisdictions adopted a rule that prevented jurors from testifying about their own subjective beliefs, thoughts, or motives but allowed testimony about objective facts and events. The more commonly adopted rule follows the federal rule, which closely follows the Mansfield rule and prohibits inquiry into "'any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.'" *Pena-Rodriguez v. Colorado*, __ U.S. __, 137 S. Ct. 855, 863-65, 197 L. Ed. 2d 107 (2017) (quoting Federal Rule of Civil Procedure 606[b]). Kansas has adopted no-impeachment rules similar to the federal rule.

> "Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined." K.S.A. 60-441.

> "This article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441. . . ." K.S.A. 60-444(a).

Accordingly, a court's inquiry after recalling a jury is limited to extrinsic matters of physical facts, conditions, or occurrences of juror misconduct. See *State v. Franklin*, 264 Kan. 496, 503-04, 958 P.2d 611 (1998) ("A juror may not impeach his or her verdict on any ground inherent in the verdict itself or divulge what considerations influenced him or her in arriving at the verdict. Inquiry may be made into the extrinsic matters of

physical facts, conditions, or occurrences of juror misconduct, either within or without the jury room, which were material to the issues being determined."). "Extrinsic" means information outside of the normal deliberation process. See *State v. Boyles*, 567 N.W.2d 856, 859 (S.D. 1997).

> "The difference between extraneous and intrinsic information was explained in [*State v. Wilkins*, 536 N.W.2d 97 (S.D. 1995)]. Intrinsic information, about which testimony is prohibited, involves '(1) the effect such extraneous information had upon their minds; (2) statements or discussions which took place during deliberations; or (3) evidence of "intimidation or harassment of one juror by another, or other intra-jury influences."' 536 N.W.2d at 99 (citation omitted). Extrinsic information may include 'media publicity, conversations between jurors and non-jurors, and evidence not admitted by the court.'" *Boyles*, 567 N.W.2d at 859.

The juror statements upon which Odom relied in seeking a judgment of acquittal or a new trial involve statements revealing the thought processes of at least two jurors. These statements therefore appear to fall within the prohibition expressed in K.S.A. 60-441. Odom does not argue that the statements constitute extrinsic evidence but essentially concedes that the statements are prohibited by K.S.A. 60-441.

Instead, Odom contends that the Sixth Amendment right to a fair trial provides an exception to the no-impeachment rule of K.S.A. 60-441. Odom did not make this argument to the district court. Generally, constitutional issues are not properly raised for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Nevertheless, as Odom contends, an appellate court may properly consider a constitutional issue raised for the first time on appeal if (1) the newly asserted theory involves only a question of law arising on approved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; or (3) the judgment of the trial court may be upheld even though it assigned an incorrect legal theory to support its decision.

7

*State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). Odom argues the applicability of the second exception because the juror misconduct deprived Odom of his due process right to the presumption of innocence and an impartial jury.

Whether a constitutional exception to the no-impeachment rule exists under these circumstances may be argued on the basis of two of the recognized exceptions for raising an issue for the first time on appeal: the issue is a question of law on settled facts and the issue involves fundamental rights. The right to a jury trial by an impartial jury and a conviction only upon proof beyond a reasonable doubt are pillars of American jurisprudence. See *Sullivan v. Louisiana*, 508 U.S. 275, 278, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) ("[T]he jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt."); *Morgan v. Illinois*, 504 U.S. 719, 729-30, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992) ("The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury."). Accordingly, this issue can be considered for the first time on appeal.

A constitutional exception to the no-impeachment rule has been recognized by the United States Supreme Court in several cases. See *Warger v. Shauers*, 574 U.S. __, 135 S. Ct. 521, 529, 190 L. Ed. 2d 422 (2014); *Tanner v. United States*, 483 U.S. 107, 126-27, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987); *McDonald v. Pless*, 238 U.S. 264, 269, 35 S. Ct. 783, 59 L. Ed. 1300 (1915); *United States v. Reid*, 53 U.S. 361, 366, 13 L. Ed. 1023 (1852). However, a constitutional exception has been actually analyzed by the Court in only three cases, and the Court has found a Sixth Amendment exception to the no-impeachment rule in only one of those cases. See *Pena-Rodriguez*, 137 S. Ct. at 865-67. That case involved racially discriminatory comments in deliberations. Though the Court held that the Sixth Amendment right to due process provided the constitutional basis for an exception to the no-impeachment rule, its analysis focused primarily the judiciary's need to purge systemically all vestiges of racism from the administration of justice. *Pena-Rodriguez*, 137 S. Ct. at 867-68.

8

"Racial bias of the kind alleged in this case differs in critical ways from the compromise verdict in *McDonald*, the drug and alcohol abuse in *Tanner*, or the pro-defendant bias in *Warger*. The behavior in those cases is troubling and unacceptable, but each involved anomalous behavior from a single jury—or juror—gone off course. Jurors are presumed to follow their oath, [citation omitted], and neither history nor common experience show that the jury system is rife with mischief of these or similar kinds. To attempt to rid the jury of every irregularity of this sort would be to expose it to unrelenting scrutiny. 'It is not at all clear . . . that the jury system could survive such efforts to perfect it.' *Tanner*, 483 U.S. at 120.

"The same cannot be said about racial bias, a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice. This Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns. An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy." *Pena-Rodriguez*, 137 S. Ct. at 868.

The statements challenged by Odom as juror misconduct encompass the thought processes—inappropriate as they may be—of individual jurors, not a systemic breakdown of the jury process as a whole. Consequently, the juror misconduct in this case more closely resembles the anomalous behavior at issue in *Tanner* and *McDonald* than the systemic problem of racism addressed in *Pena-Rodriguez*. There is no evidence in this record that juries routinely disregard the district court's instructions to decide the case on the evidence. In fact, there is no evidence in this record that 10 of the 12 jurors did not decide the case on the evidence. Constitutionally speaking, a verdict need not be unanimous. See *State v. Voyles*, 284 Kan. 239, 250-51, 160 P.3d 794 (2007) (citing *Johnson v. Lousiana*, 406 U.S. 356, 92 S. Ct. 1620, 32 L. Ed. 2d 152 [1972]; *Apodaca v. Oregon*, 406 U.S. 404, 92 S. Ct. 1628, 32 L. Ed. 2d 184 [1972]).

The statements alleged by Odom constitute two distinct challenges: (1) Juror R.S.'s statements attacking his own verdict on grounds that he allegedly did not believe

the victim's statements and instead believed Odom's son's testimony, which generally supported Odom, and (2) statements made by some unidentified male juror suggesting that the juror convicted Odom because of some vague impression of wrongdoing rather than proof beyond a reasonable doubt of the charged crimes.

The first set of statements constitute a juror's attack on his own verdict. Federal courts considering similar challenges have rejected such attacks under the no-impeachment rule. See *United States v. Vannelli*, 595 F.2d 402, 407 (8th Cir. 1979) (upholding denial of motion for new trial based upon juror statement that indicated she made the wrong decision); *United States v. Miller*, 806 F.2d 223, 225 (10th Cir. 1986) (no impeachment of verdict with juror's own statement that she misunderstood the instructions). Courts also do not normally entertain evidence of a coerced verdict unless the evidence includes threats of violence. See *Anderson v. Miller*, 346 F.3d 315, 327 (2d Cir. 2003) ("It is certainly far from unreasonable to conclude that credible allegations of threats of violence leveled by one juror by another would fall within this exception."); *Jacobson v. Henderson*, 765 F.2d 12, 14-15 (2d Cir. 1985) (upholding denial of relief based on juror affidavit that another juror screamed, hysterically cried, banged his fists, called other jurors names, and used obscene language to coerce a verdict because jurors had ample opportunity to bring misconduct to the court's attention before the verdict). The record provides no indication if or why R.S. felt compelled to convict Odom and certainly contains no indication of threats against him. It may be that R.S. simply has second thoughts about his verdict. This does not provide a proper basis for impeaching a verdict. *Miller*, 806 F.2d at 225.

"The most difficult decisions that a Court can make require it to balance the need for finality and procedural regularity against the possibility, however faint, of injustice. Any effort to draw a proper line between the two will never be perfect, nor will it be satisfactory to all involved. Nevertheless, the Court's duty is to ensure that one side of the balance does not swallow the other. In the absence of clerical error in entering a verdict into a verdict form, or improprieties of the nature described in Rule 606, any rule that a

10

juror could impeach a sworn statement she made in open court agreeing with a verdict would open the door to the overturning of verdicts based on second thoughts, changed minds, improper influence, and hindsight. There was be no principled boundaries for the application of such a rule, and no verdict would be truly final. Jury deliberations would become the fodder for fishing expeditions launched by those disappointed with the unfavorable verdicts." *Imperial Trading Co., Inc. v. Travelers Property Cas. Co. of America*, No. 06-4262, 2009 WL 2922307, at *7 (E.D. La. 2009).

The jury was polled in this case. R.S. did not express any reservation in the verdicts. See *United States v. Weiner*, 578 F.2d 757, 764 (9th Cir. 1978) (upholding denial of a new trial based on statements of juror that he voted guilty "with reservation," but did not indicate these reservations when the jury was polled). His discomfort with the verdict after the fact does not provide a constitutional basis for undermining the finality of the verdict.

The other set of statements suffer from a lack of proof. The district court was not presented with R.S.'s sworn statement that the unidentified juror made the statements alleged. Instead, the district court was presented with the allegations of Odom's attorney that R.S. stated that this unidentified juror made the inappropriate comments. R.S. could not be bothered to attend the hearing and provide testimony to what he heard. And Odom did not provide the name of this unidentified juror as directed by the district court.

Assuming that the unidentified juror made the comments in question, there is nothing in the record to indicate what that juror's ultimate thought process was in making the decision to vote guilty. Even if the district court took the unidentified juror's comments at face value, the comments indicate only that one juror misapplied the pertinent law and facts of the case in arriving at a verdict. One juror's understanding of the thought processes of another juror is not a sufficient basis to impeach a verdict. See *United States v. D'Angelo*, 598 F.2d 1002, 1003 (5th Cir. 1979).

11

"[T]he no-impeachment rule has substantial merit. It promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts." *Pena-Rodriguez*, 137 S. Ct. at 865.

In *Tanner*, the United States Supreme Court recognized that issues of misconduct arising during deliberations may be brought to the court's attention before the jury arrives at a verdict. 483 U.S. at 127 (citing *Lee v. United States*, 454 A.2d 770 [D.C. App. 1982], *cert. denied sub nom. McIlwain v. United States*, 464 U.S. 972, 104 S. Ct. 409, 78 L. Ed. 2d 349 [1983]); see also *Warger*, 135 S. Ct. at 529 ("Even if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered."); *Jacobson*, 765 F.2d at 14-15 (refusing to consider posttrial affidavits of jurors alleging misconduct in part because jurors had ample opportunity to bring misconduct to the attention of the court during deliberations). There is no reason why R.S. could not have sent a message to the district court during deliberations indicating discomfort with statements by other jurors who seemed to be ignoring the evidence and/or the court's instructions.

This case does not demonstrate the exceptional circumstances necessary to circumvent the operation of K.S.A. 60-441 and undermine the finality of the verdict on constitutional grounds. Because the situation does not support a Sixth Amendment exception to the no-impeachment rule of K.S.A. 60-441, the allegations of juror misconduct raised by Odom's counsel in the motion for judgment of acquittal/new trial, even if affirmatively established by a recall of the jury, could not properly be received by the district court. As a result, the district court did not abuse its discretion in refusing to conduct a recall of the jury.

12

DID THE DISTRICT COURT ILLEGALLY SENTENCE ODOM
TO LIFETIME POSTRELEASE SUPERVISION?

Next Odom contends that the district court erred in sentencing him to lifetime postrelease supervision. As Odom notes in his brief, he did not raise the issue at sentencing, but the court is not precluded from considering the issue because an illegal sentence may be corrected at any time, including the first time on appeal. *State v. Fisher*, 304 Kan. 242, 263-64, 373 P.3d 781 (2016).

An illegal sentence within the meaning of K.S.A. 2017 Supp. 22-3504(1) encompasses a sentence imposed by a court without jurisdiction, a sentence that fails to conform to the applicable statutory provisions (either in character or in terms of the authorized punishment), or a sentence that is ambiguous with respect to the time and manner in which it is to be served. *State v. Gray*, 303 Kan. 1011, 1014, 368 P.3d 1113 (2016). In the present case, Odom contends that the imposition of lifetime postrelease supervision fails to conform to the applicable sentencing statutes. Interpretation and application of a statute is a question of law subject to plenary appellate review. See *State v. Nguyen*, 304 Kan. 420, 422, 372 P.3d 1142 (2016).

K.S.A. 2017 Supp. 22-3717 governs the imposition of both parole and postrelease supervision. K.S.A. 2017 Supp. 22-3717(b)(6) directs that an inmate sentenced under K.S.A. 21-6627 (Jessica's Law) must serve the mandatory prison term without a reduction for good time credit before becoming eligible for parole. K.S.A. 2017 Supp. 22-3717(u) provides:

> "An inmate sentenced to imprisonment pursuant to K.S.A. 21-4643, prior to its repeal, or K.S.A. 2017 Supp. 21-6627, and amendments thereto, for crimes committed on or after July 1, 2006, shall be placed on parole for life and shall not be discharged from supervision by the prison review board. When the board orders the parole of an inmate

13

pursuant to this subsection, the board shall order as a condition of parole that the inmate be electronically monitored for the duration of the inmate's natural life."

Clearly, the proper sentence required mandatory lifetime *parole* rather than lifetime *postrelease supervision*. The State suggests that the district court vacate this portion of the sentence, but the mandatory rather than discretionary nature of the imposition of parole does not permit this remedy. Moreover, contrary to the State's suggestion, the district court may not simply change the sentence to lifetime parole instead of lifetime postrelease supervision, even if that is what the district court subjectively intended because parole and postrelease supervision are not legally synonymous. See *State v. Cash*, 293 Kan. 326, 330, 263 P.3d 786 (2011); *State v. Ballard*, 289 Kan. 1000, 1014, 218 P.3d 432 (2009). Sentencing is a critical stage of the criminal prosecution and requires the presence of the criminal defendant. See K.S.A. 2017 Supp. 22-3405; *State v. Hall*, 298 Kan. 978, 987, 319 P.3d 506 (2014) ("[A]ny completion of sentencing must take place in the defendant's presence in open court."). As a result, this court may not simply vacate the part of the district court's sentencing order imposing lifetime postrelease supervision on each of Odom's convictions; the case must be remanded to the district court for resentencing.

Convictions affirmed, sentences vacated, and remanded with directions.