2004 SD 31

**Jason BOYLES, Petitioner
and Appellant,**

v.

**Douglas WEBER, Warden South
Dakota State Penitentiary,
Respondent and Appellee.**

No. 22743.

Supreme Court of South Dakota.

Argued Jan. 13, 2004.

Decided March 3, 2004.

Bruce Ellison, Rapid City, for petitioner and appellant.

Lawrence E. Long, Attorney General, Sherri Sundem Wald, Assistant Attorney General, Pierre, for respondent and appellee.

SABERS, Justice.

[¶ 1.] Petitioner Jason Boyles appeals from findings of fact, conclusions of law and order issued by the habeas court denying his application for writ of habeas corpus. Boyles argues 1) the habeas court erred in denying his motion for a new trial based on newly discovered evidence; and 2) his trial and appellate counsel were ineffective.

## FACTS

[¶ 2.] After two trials, the first of which ended with a hung jury, Boyles was convicted of Second Degree Murder. The facts of that case and conviction are detailed in our decision affirming the conviction in *State v. Boyles*, 1997 SD 99, 567 N.W.2d 856.

[¶ 3.] Early on the morning of August 10, 1995, after an evening of drinking, Boyles and Harvi Lynn Sharp Butte were traveling south of White River when they came upon Ronald Stranger Horse. Stranger Horse was walking alongside the road. According to Sharp Butte, they discussed whether they should offer him a ride, but Boyles decided not to. Instead, he turned the car around, sped up, said, "watch this," and ran Stranger Horse over from behind.[1] Stranger Horse flew through the air, struck the passenger side windshield, bounced off the top of the car, struck the rear windshield and flew into the ditch. It was estimated that at the time of impact, the car was traveling between 60 and 65 miles per hour. There were no marks to indicate that the vehicle attempted to stop or take any evasive action before striking Stranger Horse.

[¶ 4.] Boyles suffered from alcohol and trauma induced amnesia and could remember nothing from the incident. He underwent forensic hypnosis performed by Dr. Mathias E. Stricherz. Although the videotape of his hypnosis was permitted at his first trial, the trial court limited admission at the second trial. The videotape was not shown to the second jury, but Dr. Stricherz was permitted to testify to what Boyles said under hypnosis.[2] According to Boyles' hypnotically induced memory, Sharp Butte was driving the car at the time it struck Stranger Horse. At both trials, the only testifying eye witness to the crime was Sharp Butte and her veracity was extensively attacked by the de-

---

1. This is only one of the versions of events given by Sharp Butte. As we noted on direct appeal, Sharp Butte's first version of events was:

   that she, Boyles and others had been drinking alcohol and driving around White River together the night before the incident, but because she got into a fight with her sister at Horse Creek, four miles south of White River, she decided to walk back alone. As

she walked, she said Boyles drove past her and ran down Stranger Horse; then he stopped, ordered her to get in, and later dropped her off at Swift Bear.

   *Boyles*, 1997 SD 99 at ¶ 5, 567 N.W.2d at 857.

2. We did not address the admissibility of the videotape on direct appeal. *Boyles*, 1997 SD 99 at ¶ 6, 567 N.W.2d at 858 n. 3.

fense. Boyles was convicted, he appealed to this Court and we affirmed his conviction.

[¶5.] On February 26, 2002, Boyles filed an Application for Writ of Habeas Corpus. The habeas court held an evidentiary hearing on October 3, 2002. Boyles argued that he was entitled to a new trial based on newly discovered evidence. He called a number of witnesses and introduced several affidavits. The witnesses testified either that they heard Sharp Butte admit to being the driver or they saw her driving Boyles' car on the morning Stranger Horse was killed. The habeas court found that the witnesses were not credible because several were either friends or relatives of Boyles and "many" had been prosecuted by, and held a personal dislike for the State's Attorney. The court also noted that several witnesses knew about the case at the time of trial but chose not to get involved. Boyles also argued ineffective assistance of trial and appellate counsel. The court found that counsel was not ineffective. Boyles appeals raising two issues:

1. Whether the habeas court erred by denying Boyles' motion for a new trial based on newly discovered evidence.

2. Whether the habeas court erred in finding that trial and appellate counsel were effective.

## STANDARD OF REVIEW

[¶6.] A habeas corpus claim is a collateral attack on a final judgment and therefore our review is limited. *Hays v. Weber*, 2002 SD 59, ¶11, 645 N.W.2d 591, 595 (additional citations omitted). Habeas corpus reaches only jurisdictional error and is not a remedy to correct irregular procedures. *Id.* In a criminal case, constitutional violations will deprive the trial court of jurisdiction. *Id.* The petitioner bears the initial burden to prove by a preponderance of the evidence that he is entitled to relief. *Siers v. Class*, 1998 SD 77, ¶10, 581 N.W.2d 491, 494 (additional citations omitted). The habeas court's findings will not be overturned unless they are clearly erroneous. *Id.*

[¶7.] Our standard for reviewing claims of ineffective assistance of counsel is also well-settled:

Whether a defendant has received ineffective assistance of counsel is essentially a mixed question of law and fact. In the absence of a clearly erroneous determination by the circuit court, we must defer to its findings on such primary facts regarding what defense counsel did or did not do in preparation for trial and in his presentation of the defense at trial. This [C]ourt, however, may substitute its own judgment for that of the circuit court as to whether defense counsel's actions or inactions constituted ineffective assistance of counsel.

*Hays*, 2002 SD 59 at ¶12, 645 N.W.2d at 596 (quoting *Rodriguez v. Weber*, 2000 SD 128, ¶28, 617 N.W.2d 132, 142).

[¶8.] 1. **WHETHER THE TRIAL COURT ERRED BY DENYING BOYLES' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.**

[¶9.] At the habeas hearing, Petitioner alleged that newly discovered evidence entitled him to a new trial. To that end, the habeas court permitted him to introduce testimony from eight witnesses. The witnesses testified either 1) they heard Sharp Butte admit to driving the car; or 2) they saw Sharp Butte, or a female, driving the car before or after the homicide. The habeas court denied the motion for a new trial, finding that the witnesses lacked credibility. Specifically, the habeas court found:

[M]any of the Petitioner's witnesses or their close friends/relatives had been prosecuted by the prosecutor that prosecuted the Petitioner and certainly held a personal dislike for the prosecutor and this affected their credibility regarding this matter. Also some of these witnesses testified that they knew about the case at the time (five or six years before)[,] "but just didn't want to get involved."

The court found that the testimony "would not have changed the outcome of the trial" and did not "undermine the court's confidence in the verdict, nor does the evidence require a new trial."

■■■ [¶ 10.] As we have previously noted, review of a habeas corpus proceeding is strictly limited because it is a collateral attack on a final judgment of conviction. We have repeatedly reiterated that habeas review is limited to:

1.  Whether the court has jurisdiction of the crime and the person of the defendant;

2.  whether the sentence was authorized by law; and

3.  whether an incarcerated defendant has been deprived of basic constitutional rights.[3]

Hays, 2002 SD 59 at ¶ 11, 645 N.W.2d at 595 (quoting Bradley v. Weber, 1999 SD 68, ¶ 12, 595 N.W.2d 615, 619) (additional citations and quotations omitted). Peti-

tioner provides no basis upon which to grant habeas relief other than his assertion that the new evidence undermines confidence in the verdict. Petitioner does not identify, and we cannot perceive, a constitutional violation under this issue.[4]

■■■ [¶ 11.] Newly discovered evidence is generally an insufficient ground for habeas relief when the evidence pertains to guilt rather than a deprivation of constitutional rights or lack of jurisdiction. See e.g. Herrera v. Collins, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203, 216 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying state criminal proceedings[.]") (additional citation omitted); Everitt v. Solem, 412 N.W.2d 119, 123 (S.D.1987) ("A change of testimony, additional testimony or additional evidence might be grounds for a new trial or some other relief, but they are not appropriate for granting habeas corpus relief."). Petitioner's claim that he should be entitled to a new trial based on this newly discovered evidence is therefore not within the jurisdiction of this Court or the circuit court in a habeas action unless it directly establishes a deprivation of constitutional rights, such as ineffective assistance of counsel.

---

3.  Although not at issue in this case, we have also held that a failure to comply with substantive statutory procedures is subject to challenge in habeas proceedings. Security Sav. Bank v. Mueller, 308 N.W.2d 761, 762 (S.D.1981).

4.  The only support cited in Petitioner's brief for this issue is State v. Gehm, 1999 SD 82, 600 N.W.2d 535. In Gehm, we reviewed a trial court's denial of a defendant's motion for a new trial based on newly discovered evidence under SDCL 23A–29–1, which provides:

A motion for new trial may be made under the same conditions specified and in the same manner as provided by § 15–6–59(b), except that said motion shall be served and filed not later than ten days after filing of the judgment.

Petitioner does not meet the criteria for allowing the trial court to re-open his case. The time to file for a new trial based on newly discovered evidence lapsed ten days after his conviction of judgment on July 30, 1996.

[¶ 12.] Therefore, the habeas court's denial of the motion for a new trial should be affirmed unless Petitioner establishes that the court's findings as to the new witnesses' credibility were clearly erroneous and the evidence establishes a deprivation of constitutional rights.

[¶ 13.] Petitioner presented eight witnesses at the habeas hearing; Rodell Murphy, Kevin Youngman, Mia Youngman, Margaret Hopkins, Roy Moran, Sr., Peggy Moran, Nola Brill, Mark Good Shield and Christine Bear Heels.

[¶ 14.] Murphy testified that he was at a party in July 1996 when he heard Sharp Butte say that she had "killed a man before" by running him over. Murphy testified he did not know Sharp Butte at the time he heard her make this statement. However, he testified he learned her identity "about two months later" when his girlfriend, who later became his wife, informed him of Sharp Butte's identity. He learned her identity when the couple saw Sharp Butte at the Frontier Bar and Murphy told his girlfriend about Sharp Butte's earlier admission. On cross-examination, Murphy made the questionable claim that he did not know, and that his girlfriend/wife never informed him, that she is related to Boyles.

[¶ 15.] Kevin Youngman testified that on the morning of the homicide, when it was "just getting light out" he saw "Jason and Harvi Lynn and the Two Hawk girls. They came down there, the Two Hawk girls; and I seen Harvi Lynn jumping in the driver's seat and they went for a ride. They came up town; then ten minutes later they came back down." He testified that when they "came back down," Sharp Butte was driving. On cross-examination, Youngman conceded that 1) he had been drinking the night he saw Boyles and Sharp Butte; 2) the prosecutor had prosecuted him and he was convicted and sent to the penitentiary; 3) he did not like the prosecutor; and 4) he was a "pretty good friend" of Boyles.

[¶ 16.] Mia Youngman, wife of Kevin, testified that on the morning of the homicide, she left Nola Brill's house to go home and prepare for work. She testified that sometime before 7:00 a.m. when "it was getting light out," she saw Boyles and Sharp Butte at a stop sign pulling out of the Horse Creek Community. She testified that Sharp Butte was driving and Boyles was in the passenger side and that the windshield was still intact. Her testimony also revealed that she had been related to Boyles by marriage. Youngman further testified that 1) she considered herself a friend of Boyles; 2) she had never discussed the case with her husband, Kevin Youngman; and 3) she didn't come forward with this information at trial because she "didn't want to get involved" even though she knew Boyles was being prosecuted for murder.

[¶ 17.] Margaret Hopkins testified that she was at the Frontier Bar, standing outside, when she overheard Sharp Butte tell her sister, Tanya Sharp Butte, that she was "scared" and "couldn't handle it anymore" because "I was the one driving the car, and I hit that man and I just left. I drove off, and I got-put Jason over on the passenger's side when we came to a stop." On cross-examination, it was revealed that 1) Hopkins overheard this conversation in August 1995, before the trial, and failed to inform anyone because she was scared and "didn't know who I was supposed to report it to"[5]; 2) Hopkins had a physical altercation with Sharp Butte; 3) she did not speak to the habeas attorney about what she heard until after Boyles' father ar-

---

5. She later acknowledged that she could have reported it to legal authorities.

ranged for a meeting; and 4) she had previously been charged with perjury.

[¶ 18.] Roy Moran, Sr. testified that he overheard Sharp Butte telling another "young lady" that "she was afraid if they ever found out the truth, she would go to jail for a long, long time." He overheard this conversation while he was at Joe Chasing Horse's home in Rapid City, "seeing him about some buffalo." He testified that it was about 9:00 at night and he was sitting at Chasing Horse's kitchen table having coffee and visiting when he overheard the conversation coming from the next room. Chasing Horse did not testify at the habeas hearing. Cross-examination revealed that 1) Chasing Horse is Boyles' uncle; and 2) Moran and Boyles' father are "pretty good friends."

[¶ 19.] At trial, Gloria Moran testified that on the morning of the homicide, Boyles drove up near her home with the windshield of his car destroyed and Sharp Butte climbed out of the passenger side and asked Moran to call the police. At the habeas hearing, Petitioner called Peggy Moran, wife of Roy. Peggy is Gloria's sister-in-law. She testified that on the day of the accident, Gloria told her that she saw Harvi Lynn get out of the driver's seat and that while she was talking with Harvi Lynn, "Jason crawled out of the back seat of the car on the driver's side" and drove the car away. On cross-examination, it was revealed that Peggy was a pretty good friend of the Boyles and that she knew Gloria had testified at the trial. Peggy did not come forward to testify at the trial.

[¶ 20.] Nola Brill testified that she went out to her car at about 6:00 a.m. the morning of the homicide and saw the Boyles car. She testified that it stopped at a stop sign and she looked at the vehicle and noticed that Sharp Butte was driving, and that the windshield was broken. She stated that she saw someone was in the passenger side and assumed it was Jason. On cross-examination it was revealed that 1) the prosecutor had prosecuted both Brill and her son; 2) she had told Boyles' father about what she had seen, but not until after the trial; and 3) she knew Boyles was being prosecuted for murder, but she did not know why she did not tell anyone about what she had seen before or during the trial.

[¶ 21.] Mark Good Shield testified that he saw Sharp Butte "giggle and [nod] her head yes" when she was asked if she got away with a hit and run. He indicated that he saw this "about a year, two years" after the homicide. Cross-examination revealed 1) the prosecutor had prosecuted Good Shield and he had been given prison time; 2) although he would hate to see an innocent man convicted, he did not come forward when he heard the remarks because he "didn't want to be involved;" and 3) with regard to why he never told authorities about the conversation, "[i]t's kind of hard to say because when I got up the next day, I was hung over and I just couldn't believe what I heard, and I didn't know if anybody else heard it[.]"

[¶ 22.] Christine Bear Heels testified that she saw the Boyles car leaving Swift Bear while it was still dark. She stated that she saw Sharp Butte driving and that she knew it was Sharp Butte because "she used to have this really red hair back then[.]" Cross-examination revealed 1) Bear Heels is Mark Good Shield's sister; 2) although it was dark, she could see Sharp Butte's red hair; and 3) all she could see was Sharp Butte's hair, not her face.

[¶ 23.] Petitioner bears a heavy burden when collaterally attacking a judgment of conviction and we will not reverse a habeas court's findings of fact unless they are clearly erroneous. *Brakeall v.*

*Weber*, 2003 SD 90, ¶ 6, 668 N.W.2d 79, 82. Petitioner failed to establish that the court's finding that the witnesses lacked credibility was clearly erroneous. Credibility determinations are matters for the trier of fact, *Hurney v. Class*, 1996 SD 86, ¶ 13, 551 N.W.2d 577, 582 (citing *State v. Hage*, 532 N.W.2d 406 (S.D.1995)), and we will not substitute our judgment for that of the judge who saw the demeanor and heard the testimony of the witnesses.

[¶ 24.] The testimony also fails the criteria for granting a new trial based on newly discovered evidence. In *State v. Gehm*, we held that in order to prevail, the defendant had to show:

1. The evidence was undiscoverable by the movant at the time of trial;

2. The evidence is material, not merely cumulative or impeaching;

3. That it would probably produce an acquittal; and

4. No lack of diligence caused the movant to fail to disclose the evidence earlier.

*Gehm*, 1999 SD 82 at ¶ 13, 600 N.W.2d at 540. As the State points out, Youngman, Brill and Bear Heels all testified that they observed Sharp Butte driving on the night of the accident. If true, this testimony could have been discovered prior to trial. The testimony of Hopkins, Murphy, the Morans and Good Shield is unlikely to produce an acquittal given the substantial credibility problems each witness presented.

[¶ 25.] The habeas court is affirmed because the evidence fails to establish a deprivation of constitutional rights.

[¶ 26.] **2. WHETHER THE HABEAS COURT ERRED IN DETERMINING THAT TRIAL AND APPELLATE COUNSEL WERE EFFECTIVE.**

[¶ 27.] We rely on the test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) for determining whether counsel was ineffective. To establish ineffective assistance of counsel, Defendant must prove 1) that counsel's representation fell below an objective standard of reasonableness and 2) that such deficiency prejudiced him. *Id.* We have held that there is prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the proceeding would have been different." *Siers*, 1998 SD 77 at ¶ 12, 581 N.W.2d at 495 (citations and quotations omitted). It is insufficient to show that the verdict would have been different; rather, Defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Furthermore:

There is a strong presumption that counsel's performance falls within the wide range of professional assistance and [t]he reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances and the standard of review is highly deferential. The petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Siers*, 1998 SD 77 at ¶ 12, 581 N.W.2d at 495 (quoting *Sprik v. Class*, 1997 SD 134, ¶ 23, 572 N.W.2d 824) (additional and internal citations omitted).

[¶ 28.] Boyles alleges five instances of ineffective assistance of trial counsel and two instances of ineffective assistance of appellate counsel:

1. Failure to investigate or discover exculpatory and impeaching evidence

and failure to present a complete defense;

2. Failure to appeal the trial court's refusal to admit the video of the hypnosis session;

3. Failure to properly confront witnesses or present a defense;

4. Failure to request a cautionary instruction on improper vouching or bolstering;

5. Failure to object to improper vouching during closing arguments;

6. Failure to object to improper use of leading questions and appeal the trial court's denial of a motion for mistrial based on the leading questions.

We will address each claim of error in order.

[¶ 29.] 1. *Failure to Investigate or Discover Exculpatory and Impeaching Evidence.*

**Tony Valandra**

[¶ 30.] Before the trial, the prosecutor indicated that defense counsel had all of the discovery available to the State. The evidence in the State's file included a handwritten report by White River Police Officer Joe Krogman detailing an interview with Tony Valandra. The report indicated that Valandra saw the Boyles vehicle several times the morning of the crime. The report quoted Valandra stating that one of the times he saw the car, it was "traveling south on 83 with some girl driving it." At the habeas hearing, trial counsel testified that he never saw the report. Therefore, this potentially exculpatory witness was never called. Boyles argues that the statement corroborated Boyles' hypnotically induced memory and "placed Sharp Butte driving south on Highway 83

when she then struck and killed Stranger Horse." Boyles further alleges that trial counsel was aware of another potential witness, Dawn Andrews, who testified at the first trial that she saw Sharp Butte exit the driver's side of the car after it pulled to a stop in White River. Trial counsel did not call Andrews at the second trial because of concern that she lacked credibility. Boyles asserts that had trial counsel known of the Valandra interview, he would have called Andrews and Valandra to testify.

[¶ 31.] The prosecutor had an open file and the Valandra report was apparently in the file. Respondent concedes that Valandra's statement was not investigated prior to trial and "as a result[,] counsel's performance was deficient."[6] The habeas court did not specifically address whether failure to see and investigate the police report was deficient performance, but made the broad conclusions that "the petitioner has not established any prejudice on this record" and "any errors regarding counsel's failure to object to leading questions, improper bolstering, to appeal certain evidentiary rulings[,] adequately confront the State's expert [ ] do not rise to the level necessary to establish deficient performance by trial counsel." Even assuming the trial court implicitly found counsel's performance deficient, Petitioner does not establish that the deficiency prejudiced his defense. The report, such as it is, provides verbatim:

> Tony Valandra–Said seen the car 3–4 times that nite. Earlier first time he seen it said Sheri Two Hawk and some young girls were in the car with Jason. 2nd time around 4:00 a.m. car traveled through alley was standing on upper step car pulled through Jason hollered

---

6. We note that trial counsel testified that although the prosecutor informed him of his "open file," trial counsel did not go to the prosecutor's office to look at the file. This could explain why counsel did not see the report.

something they didn't hear for sure what, didn't pay attention. Asked who was in the car and who was driving said windows were too dark. Next time he seen the car traveling south on 83 with some girl driving it. Then he heard a[n] engine racing and it came in from the street north of apartments and traveled into the parking lot of the apartments, and took off south headed towards main. This time Tony said it was smashed up windshield and hood rear window looked like it had been rolled. About 5 minutes later, it came through the alley headed north and ran over a horse shoe stake in the alley and turned east [illegible] street. Next time it was at SCS office. Tony called John Boyles told him car was all smashed up. Kept saying Jason driving crazy. And him driving.

We have held that "[s]tanding alone, the fact that defense counsel failed to investigate a witness does not by itself satisfy the prejudice prong of *Strickland*." *Siers*, 1998 SD 77 at ¶ 25, 581 N.W.2d at 497–498 (citing *Hadley v. Groose*, 97 F.3d 1131, 1135 (8th Cir.1996)). For Boyles to establish prejudice based on trial counsel's failure to investigate Valandra as a potential witness, he must show "that the witness would have testified and that their testimony would have *probably* changed the outcome of the trial." *Id.* (Additional citations omitted.) (Emphasis in original). Our analysis of this issue requires us to consider:

1. The credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses;

2. The interplay of the uncalled witnesses with the actual defense witnesses called; and

3. The strength of the evidence actually presented by the prosecution.

*Id.* (quoting *McCauley–Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir.1996)).

[¶ 32.] Petitioner has not shown either that the "witness would have testified" or that it would "have probably changed the outcome of the trial." At the habeas hearing, Petitioner did not call Krogman, Valandra, or the purported corroborating witness, Andrews. Petitioner merely entered the police report into evidence and elicited testimony from trial counsel that Valandra would have been an important witness and that he would have corroborated Andrews' testimony. Since Petitioner called none of these witnesses at the habeas hearing, we have no way of knowing how they would have testified under oath and subject to cross-examination. *See Sprik*, 1997 SD 134 at ¶ 59, 572 N.W.2d at 834.

[¶ 33.] The police report standing alone is insufficient to establish that Petitioner was prejudiced. Although the report indicates that at some point during the evening, Valandra saw "some girl" driving, it does not identify Sharp Butte. The record indicates that at various times throughout the evening there were at least two and possibly five other women in the car. Moreover, the statement indicates that the witness saw the car on several occasions, but does not identify which occasion he saw the female driving. This is not sufficient to corroborate Andrews' testimony that she saw Sharp Butte driving the car at approximately 4:00 a.m.

[¶ 34.] The report also indicates that the witness contacted Boyles' father that morning and told him "the car was all smashed up." Given father's direct involvement in bringing several potentially exculpatory witnesses to habeas counsel, it is difficult to imagine why this witness was not brought to counsel's attention at the time of trial if he was able to place Sharp Butte in the driver's seat near the time of the homicide.

[¶ 35.] Finally, the report ends with the statement, "[k]ept saying *Jason* driving crazy. And *him* driving." Petitioner's assertion that failure to call this witness was so prejudicial that counsel was not acting as required under Sixth Amendment fails, especially when Valandra did not testify at the habeas hearing.

[¶ 36.] Petitioner's contention that Valandra's testimony, combined with that of Andrews would have probably changed the outcome of the trial also fails. Trial counsel called Andrews at the first trial and made a conscious strategy decision not to call her at the second trial because she "got crucified on cross-examination for prior problems with the law and her testimony." It was trial counsel's impression that Andrews was "not believable." Trial counsel testified that he chose not to put her on the stand without corroborating evidence and that, "I talked to Jason; I believe his father about that." Based on this record, Petitioner does not establish prejudice in failure to call Valandra.

**Margaret Hopkins**

[¶ 37.] Petitioner claims that trial counsel's investigation was insufficient because it did not discover Margaret Hopkins. As noted above, Hopkins testified at the habeas hearing that while standing outside the Frontier Bar, she heard Sharp Butte tell her sister that she was the driver that night.

[¶ 38.] Petitioner does not establish that failing to find Hopkins was deficient performance by trial counsel. Trial counsel testified to an extensive investigation conducted by himself and his law-trained private investigator. He testified that the investigator exceeded the hours allotted to him before both trials and that he and the investigator "looked for and looked for and looked for ... somebody that was credible that would put [Sharp Butte] in the driver seat." Their investigation simply did not reveal Hopkins, and "[w]hile a lawyer must investigate the obvious, a lawyer is not required to 'be a private investigator in order to discern every possible avenue which may hurt or help the client'." *Siers,* 1998 SD 77 at ¶ 22, 581 NW2d at 497 (quoting *House v. Balkcom,* 725 F.2d 608, 617 (11thCir.1984)). Hopkins did not come to light as a potential witness until she was approached by Petitioner's father, who brought her to meet with habeas counsel over five years after she allegedly heard the admission. Hopkins testified that she never reported what she heard to any authority. As Respondent notes, in order for defense counsel to have known about Hopkins' testimony he would need to be clairvoyant; a requirement we do not impose on trial counsel. *Siers,* 1998 SD 77 at ¶ 20, 581 N.W.2d at 496 n. 4 (citing *State v. Miller,* 935 S.W.2d 618, 625 (Mo.Ct.App. 1996)). Petitioner fails to meet the first prong of *Strickland* and the habeas court is affirmed on this issue.

[¶ 39.] *2. Failure to appeal the ruling denying admission of the videotape of Petitioner's hypnosis.*

[¶ 40.] At the first trial, the court allowed the defense to show the jury the videotape of Petitioner's hypnosis session with Dr. Stricherz. At the second trial, the trial court ruled that the videotape was inadmissible but allowed Dr. Stricherz to testify about the interview. The transcript of the session was also deemed inadmissible though Stricherz was permitted to use it to refresh his recollection. The court analyzed the admissibility of the videotape under SDCL 19–16–35 (FRE 804(b)(6)), otherwise known as the "catchall" hearsay

exception.[7] The court found that although the videotape met the criteria for admissibility under SDCL 19–16–35, the evidence would be more prejudicial than probative. Trial counsel did not appeal the trial court's ruling on the admissibility of the videotape on direct appeal and Petitioner asserts that failure to do so was ineffective assistance.

[¶ 41.] A videotape offered to prove the truth of the matter asserted is generally inadmissible hearsay. *Sprync-zynatyk v. General Motors Corporation,* 771 F.2d 1112 (8th Cir.1985). In *State v. Adams,* we cited with approval the analysis of the admissibility of post-hypnosis testimony in the Eighth Circuit's opinion in *Sprynczynatyk.* That case also discussed the admissibility of the actual hypnotic interview and noted:

> [C]ourts have held that the contents of actual hypnotic interviews are inadmissible for the purpose of proving that the facts recounted by the hypnotized witness actually occurred.

*Sprynczynatyk,* 771 F.2d at 1117 (citing *State v. Brown,* 337 N.W.2d 138, 153 (N.D. 1983); *State v. Beachum,* 97 N.M. 682, 643 P.2d 246, 254 (N.M.App.1981)). The tape of the session is inadmissible unless it comes within an exception to the hearsay rule or it is offered for a purpose other than to prove the truth of the matter asserted. *Id.* This video was clearly offered to prove the truth of the matter asserted, *e.g.* that Boyles was not driving. At trial, defense counsel argued that it was admissible under SDCL 19–16–35.

[¶ 42.] The Court reviewed the requirements for admissibility of evidence under SDCL 19–16–35 in *State v. Engesser,* 2003 SD 47, 661 N.W.2d 739. The majority in that case noted that in order for hearsay to be admissible under the rule, the proponent must establish:

1. the declarant is unavailable;

2. the statement has circumstantial guarantees of trustworthiness equivalent to the first four exceptions in Rule 804(b);

3. the statement is offered as evidence of a material fact;

4. the statement is more probative on the point for which it is offered than any other evidence that the proponent reasonably can procure;

5. the statement serves the interests of justice and the purposes of the rules of evidence;

6. the proponent of the evidence to be offered must have given advance notice to the other side.

*Engesser,* 2003 SD 47 at ¶ 37, 661 N.W.2d at 751. The Court noted:

> The circumstances a trial court should consider in assessing the trustworthiness of hearsay testimony include: (1) the character of the witness for truthfulness and honesty and the availability of evidence on that question; (2) whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; (3) the relationship of the witness to the parties and

---

7. The court also found that the videotape met the criteria laid out by this Court in *State v. Adams,* 418 N.W.2d 618 (S.D.1988) (overruled on other grounds). In *Adams,* this Court determined that testimony by a witness whose memory of an event is brought back through hypnosis is admissible if certain criteria are met. *Adams* is not specifically on point. Although it dealt with hypnosis generally, the primary question was whether a person may testify to memories recalled through hypnosis. In such a case the declarant would be available for cross-examination and would have an independent recollection of events. In this case, Defendant's memory of the evening never came back. He would have been unavailable for cross-examination.

any motivation the witness had for making the statement; (4) the extent to which the witness's statement reflects personal knowledge; (5) whether the witness ever recanted the statement; (6) the existence of corroborating evidence; and (7) the reasons for the unavailability of the witness. These considerations are neither exhaustive nor absolute, and each case must be analyzed on its own facts.

Even if a statement is within a hearsay exception, "[t]he balancing test of SDCL 19–12–3 [8] (Rule 403) applies." *Engesser*, 2003 SD 47 at ¶ 40, 661 N.W.2d at 752 (quoting John W. Larson, South Dakota Evidence § 804.6, p. 703 (1991)). A trial court's ruling on the admissibility of evidence is reviewed under the abuse of discretion standard. *State v. Jones*, 2002 SD 153, ¶ 6, 654 N.W.2d 817, 818 (citation omitted). Here, the trial court found that the prejudicial effect of the videotape outweighed its probative value. Petitioner provided nothing before the habeas court to establish that the trial court abused its discretion in this determination, and there is no showing of abuse of discretion on this record. The statements on the tape were not given under oath or subject to cross-examination and penalty for perjury, they were entirely self-serving, did not reflect personal knowledge because Boyles had no independent recollection of the events and there was no credible corroborating evidence.

[¶ 43.] Petitioner's assertion that the hung jury on the first trial as compared to the conviction on the second trial provides proof of prejudice misses the mark. The question is whether "there is a reasonable probability that, but for counsel's unpro-

fessional errors, the *proceeding* would have been different." *Siers*, 1998 SD 77 at ¶ 12, 581 N.W.2d at 495 (citations and quotations omitted) (emphasis supplied). Since he is alleging ineffective assistance of *appellate* counsel, the question is whether the result of the *appeal* would have been different. Because Petitioner does not establish that the trial court abused its discretion in limiting admission of the session, there is no indication that the result of the appeal would have been different.

[¶ 44.]  *3. Failure to properly confront witnesses and present a defense.*

### Glass Fracturing Expert

[¶ 45.] Petitioner argues that trial counsel failed to adequately cross-examine the State's glass fracturing expert, Agent Rawalt.

[¶ 46.] Petitioner's first assertion of ineffective assistance is that trial counsel posed a hypothetical which concluded that a passenger who had his arm in front of him could have been cut on the arm by flying glass. Petitioner asserts that eliciting this testimony was prejudicial because the hypothetical description of the position of "his arm in front of him" contradicted his statement under hypnosis that his arm was on the console between the seats. He asserts that the "hypothetical [was] useless from an evidentiary or argument standpoint."

[¶ 47.] Taken in context, the hypothetical was posed for the purpose of placing Boyles in the passenger seat. The follow-up question by counsel was, "[i]n fact, if one of the people actually had a spot where you could see blood as compared to the other one, that could be some indica-

---

8. SDCL 19–12–3 provides:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

tion that that person was behind the passenger side, also?" Counsel followed with a short series of questions attempting to get the expert to agree that the person in the passenger seat would be more likely to have bleeding cuts. This was consistent with the defense theory that Boyles had a cut on his left arm that was bleeding, Sharp Butte had only what looked like a rash, probably caused by small glass particles and therefore Boyles would have been in the primary zone of impact (the passenger's seat) because he was struck by a larger piece of glass. These questions fall within the realm of trial tactics to which we give great deference. *Meinders v. Weber,* 2000 SD 2, ¶ 43, 604 N.W.2d 248, 264 (additional citations omitted). Petitioner fails to establish that this amounted to ineffective assistance of counsel.

[¶ 48.] Next, Petitioner asserts that trial counsel failed to use the expert's report to confront the expert. He notes that "[o]n page two, Rawalt concluded the fracturing of the windshield would 'insure' the person in the passenger seat would have 'cuts' some 'severe.'" He also reported the driver would 'not be expected to suffer any type of abrasions on the left side of the body.'" Petitioner argues that Rawalt was not asked to consider David Steffen's testimony of "a large glass cut on petitioner's left arm likely made by a large fragment." Further, he asserts that Rawalt was not made to consider "the complete absence of any glass cuts on Sharp Butte." Petitioner concludes that this was a material failure because "the unused report could have been used to show Petitioner's innocence."

[¶ 49.] Petitioner overstates the evidence. First, Steffen did not testify that Boyles had a "large glass cut on [his] left arm ... likely made by a large fragment." Steffen testified that to the best of his recollection, the injury may have been on the left arm, but that it could have been on the right arm. He did not testify that it was a "large glass cut ... likely made by a large fragment." Instead, he testified that the cut was, "[n]ot a big one. Less than an inch or half inch[.]" He further testified that although the wound was "reddish," "there wasn't any blood running out of it." Regardless, it is clear that trial counsel did not specifically confront the expert with the statement that the driver would not be expected to have cuts on the left side of his or her body. However, Petitioner fails to show counsel was ineffective.

[¶ 50.] The expert was thoroughly cross-examined with the clear objective of placing Sharp Butte in the driver's seat. To that end, counsel persistently attempted to get the expert to agree that the driver could have very small glass cuts on her thighs. The purpose was to tie that testimony to the fact that witnesses described Sharp Butte as having something that looked like prickly heat, but could have been a rash caused by small particles of glass, on her thighs. This was an issue of trial strategy. Furthermore, Petitioner fails to show prejudice. The expert's report was admitted into evidence, and trial counsel took full advantage of his closing argument to point out the fact that the left arm injury was inconsistent with Boyles being the driver.

[¶ 51.] In his closing argument, trial counsel stated:

Now, how is [Boyles] going to get that puncture on his left arm if he is driving this car? [ ] The arm is facing outward. How is that glass—is it going to maybe be a piece of it, like a boomerang went flying around out of the window and come back and got him? I didn't ask Mr. Rawalt that, but how is he going to get that puncture if over there in the driver's seat driving that car? Can't.

No way he could get that puncture in his arm. [ ] That glass puncture wound on the left arm is very important. In fact, Jason is the only one that has any glass on him that cut through the skin. Jason, when he was hypnotized, said that his arm was laying [ ] on the console.

[¶ 52.] With regard to Petitioner's assertion that counsel failed to use the expert's report against him, on page 803 of the jury trial transcript, trial counsel posed a question that lifted the words right off page two of the expert's report. Specifically, counsel inquired, "you would expect to see abrasions. Glass would be of sufficient quantity and velocity to ensure that the person in the [passenger] seat would show physical indications of the glass deposit[ ]. This would include numerous cuts and scratches, ranging in size from minute to severe, depending upon the activity of the occupant." Petitioner's assertion that counsel "prejudicially failed" to utilize the expert's report in his cross-examination is not supported by the record.

[¶ 53.] Third, Petitioner contends that trial counsel failed to use the findings in the expert's report to show that Sharp Butte was the driver. He relies on testimony by Rawalt that there would be a "drastic" reduction in particle size outside the immediate zone of impact and he would expect only microscopic particles as far away as the driver's side door. He asserts that Gloria Moran testified that Sharp Butte had only "microscopic" sized pieces of glass on her body. He asserts that trial counsel should have confronted the expert with the statement in his report that the driver "could also be expected to be covered with glass, but it would be much smaller ... in size." Trial counsel's failure to ask this question is not sufficient to establish ineffective assistance. Although counsel did not refer specifically to this

language in the expert's report, he spent significant effort attempting to persuade the expert that the "rash" on Sharp Butte's thighs was consistent with her being the driver at the time of impact. It may have had more impact to confront the agent with his own words, but we decline to second-guess decisions made in the heat of cross-examination. *Loop v. Class*, 1996 SD 107, ¶ 18, 554 N.W.2d 189, 192. We have noted:

> Because of the difficulties inherent in making the evaluation [of an attorney's performance during trial], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Olesen v. Lee*, 524 N.W.2d 616, 619 (S.D. 1994) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95) (additional citations omitted). Petitioner fails to overcome the presumption that counsel's cross-examination was within this "wide range of reasonable professional assistance."

**Harvi Lynn Sharp Butte**

[¶ 54.] Petitioner alleges ineffective assistance because Sharp Butte, "was not confronted with critical impeachment evidence to further destroy her credibility[.]" Petitioner details several inconsistencies in Sharp Butte's various statements regarding the hours before the homicide. There is no question that Sharp Butte lied during the investigation. On the record are several versions of events that morning, most of which she has conceded were not true. Trial counsel spent roughly one-third (9 out of 27 pages of transcript) of his cross-examination impeaching Sharp Butte on her lies. He then brought out her violent

nature. At the habeas hearing, trial counsel testified that he felt like his cross-examination was "pretty good." Nonetheless, Petitioner contends that failure to impeach her "further" was ineffective assistance.

[¶ 55.] Petitioner contends that Sharp Butte should have been questioned regarding her earlier statements that Boyles "got mad" at Sharp Butte for beating her sister and forced her to leave the car so that she was standing on the side of the road when Boyles hit the victim with the car. She had also previously alleged that after Boyles hit the victim, he picked her up and said, "did you see that?" The very first question trial counsel asked Sharp Butte was, "[n]ow apparently when you talked to [the FBI agent], the first time you lied to him and told him that you got out of the car on the way back to White River?" She responded "yes," and counsel went on to question her further about her statement that she was walking along the road and Boyles forced her into the car after he hit the victim. Later in the cross-examination, counsel launched another series of questions regarding her lie that she was standing on the side of the road when Boyles ran into the victim. Counsel also questioned her about the lies she told several family members. He closed with a series of questions about Sharp Butte being a liar in general. Our review of the record reveals that trial counsel questioned Sharp Butte extensively regarding her previous statement to the FBI that she was not in the car when Boyles ran over the victim. Although counsel did not ask specifically about her statement that Boyles became angry and kicked her out of the car, he did make it quite clear that she lied to the Agent and to her family about the events that morning. The reason that she initially gave for why she was not in the car was a collateral

issue having nothing to do with the question of who was driving and failure to inquire is not sufficient cause to find ineffective assistance of counsel.

[¶ 56.] Petitioner next contends that counsel should have inquired into Sharp Butte's conflicting statements regarding their speed as they traveled north on the highway toward her grandmother's house. Her statements indicated that they were traveling over 60 mph, under 50 mph and 90 mph. This line of questioning is collateral to the issue of who was driving at the time the victim was killed and failure to inquire does not amount to ineffective assistance of counsel.

[¶ 57.] Petitioner asserts that Sharp Butte was not confronted regarding her testimony that after the victim was struck, Boyles "just smiled." Sharp Butte did not testify to this before the grand jury or at the preliminary hearing and she did not tell this to the FBI investigator. Trial counsel did not impeach the statement. Petitioner points out that this portrayal made him appear callous and prejudiced him. Trial counsel testified at the habeas hearing that the statement should have been addressed on cross-examination. Viewing counsel's cross-examination as a whole, counsel made a concerted effort to undermine Sharp Butte's credibility. In large measure, it appears that the case hinged on whether the jury believed Sharp Butte's testimony concerning who was driving that evening. While impeaching her regarding this statement may have been a valuable aid in undermining her credibility, counsel's cross-examination was competent and we do not find that failure to ask this question rises to the level of ineffective assistance.

[¶ 58.] Petitioner argues that trial counsel should have impeached Sharp Butte's statement that when she left the car after Boyles drove her back to the

Swift Bear Community and told him she was "going ... home," he responded, "no you're not. I'm going to run you over too." Petitioner claims this testimony was inconsistent with a prior statement to the FBI wherein she indicated that Boyles took her back to the housing area to "drop her off." Petitioner misstates the evidence. The FBI report to which he refers indicates that on two occasions, Sharp Butte told the Agent that when she started to leave the car, Boyles threatened to run her over. Counsel could not have impeached the testimony with the FBI report. Furthermore, Sharp Butte testified to this statement at the preliminary hearing and at the first trial.

[¶ 59.] Petitioner alleges trial counsel was ineffective for failing to impeach Sharp Butte with her previous statement to the FBI agent wherein she "described the presence of glass only 'in her mouth'." Again, Petitioner misstates the record. Sharp Butte informed the Agent that right before she stepped out of the car she spit out some glass that had "fallen into her mouth." At no point did she state that she only had glass in her mouth. In fact, two paragraphs above, the Agent reports that Sharp Butte informed him that after the car hit the victim, "the windshield was in her lap." This assertion of ineffective assistance is without merit.

[¶ 60.] Petitioner asserts that trial counsel was ineffective for failing to confront Sharp Butte with Andrews' and Valandra's observations that she was driving that morning. As noted above, failure to call Andrews was a matter of trial strategy and failure to call Valandra was not shown to be prejudicial.

[¶ 61.] *4. Failure to object to improper vouching or bolstering.*

**The FBI Agent**

[¶ 62.] Agent McConaghy was the agent who questioned Sharp Butte.

He testified about his conversations with Sharp Butte on the day of the homicide. Over defense counsel's objection, McConaghy testified that Sharp Butte's second version of events, that she was in the car at the time the victim was hit, was more consistent with the physical evidence than her first story. He stated that the second version was "what I believed at that point as to what had happened during the accident." The prosecutor then inquired, "did you have any reason to disbelieve she was in the passenger seat?" Defense counsel objected, arguing that the question was improper because "it's asking for a conclusion." The objection was overruled, and the witness answered, "no I did not." When the prosecutor asked the Agent why his investigation focused on Boyles, he responded that he had several witnesses placing Boyles behind the wheel around the time of the accident. He went on to state, "there was never any indication that anyone else was driving the car other than Jason." Later, the Agent testified that he was not aware of the possibility that someone other than Boyles was driving until after the hypnosis session. The prosecutor then inquired whether that information caused him to reevaluate his investigation. The Agent replied, "Yes, I think." The prosecutor asked, "And were you satisfied [with] that, or did you go on [to do] some more investigation?" The agent responded, "I was satisfied with the conclusions that I[had] come to." Petitioner contends this testimony by the Agent was improper bolstering of Sharp Butte's testimony and that trial counsel should have appealed the issue.

[¶ 63.] Taken in context, the testimony of the Agent did not bolster or vouch for Sharp Butte's testimony. He was merely testifying to the conclusions he had drawn based on his interviews of Sharp Butte and

his investigation of the homicide. He was not being asked whether Sharp Butte's testimony was truthful, but rather which of the stories she told him was more consistent with the physical evidence. Agent McConaghy was not being asked whether Defendant was guilty, but whether, based on his opinion, the physical evidence was consistent with her statement. This did not invade the province of the jury. *State v. Moran*, 2003 SD 14, ¶ 43–44, 657 N.W.2d 319, 329–330; *Engesser*, 2003 SD 47 at ¶ 33, 661 N.W.2d at 750 (plurality decision finding no reversible error when prosecutor asked police officer if he believed defendant lied during the course of the investigation). Petitioner has not established that failure to appeal this issue was prejudicial.[9]

[¶ 64.] *5. Failure to object to improper vouching during closing arguments.*

[¶ 65.] Petitioner contends that trial counsel prejudicially failed to appeal on the issue of improper bolstering by the Prosecutor and failing to request a cautionary instruction. The prosecutor made several statements Petitioner contends were improper vouching. Those statements included:

1) "I suggest there is no reason to disbelieve [Agent McConaghy]."
2) "[Agent Rawalt] told it just the way it happened."
3) "She's telling the truth."
4) "I think the state proved its case."
5) "I think we proved beyond a reasonable doubt that Jason Boyles killed that man ... I think we ... proved

... he is guilty of ... second degree."

Trial counsel objected, arguing:

Your honor, the prosecutor is vouching when he says 'I think.' That is unethical and I believe he knows it, and I ask you to remind him not to do that.

The trial court, in front of the jury, admonished:

It's not appropriate for you to think they ought to find him guilty because you think it is.

Assuming that all of the statements above constituted improper vouching, Petitioner fails to establish ineffective assistance of trial counsel. Trial counsel repeatedly testified that he was unwilling to continually object for fear that the jury would think he was trying to hide something. He also succeeded in having opposing counsel admonished before the jury for improper vouching. Finally, contrary to Petitioner's assertion, the jury was instructed on argument by counsel. The jurors received instruction # 50 which provided in part:

The attorneys will argue the case to assist you ... Their arguments are not evidence. Any argument or any statement or remark by an attorney which has no basis in the evidence should be disregarded by you.

[¶ 66.] Petitioner argues that trial counsel was ineffective for failing to raise the issue of improper bolstering on appeal. The choice of which issues to raise on appeal was a tactical decision made by trial counsel based on his beliefs regarding which issues were best for appeal. Peti-

---

9. Petitioner argues that trial counsel erred in failing to request a cautionary instruction on the Agent's bolstering. This argument fails based on our determination that the Agent's testimony was not bolstering or vouching. Furthermore, trial counsel testified at the hearing that his view of cautionary instructions is that since you can't "unring the bell," a cautionary instruction often does little other than reinforce negative testimony. This is a trial tactic which we give great deference.

tioner fails to establish that this was anything other than a tactical decision.

[¶ 67.] *6. Failure to object to and appeal prosecutor's improper use of leading questions.*

[¶ 68.] Throughout the direct examination of Sharp Butte, the prosecutor violated SDCL 19–14–20 which prohibits use of leading questions on direct-examination absent exceptions not applicable in this case. Trial counsel objected several times to the use of leading questions. He also requested a hearing outside the presence of the jury wherein he requested a mistrial because of State's continuing use of leading questions. The State asked leading questions on virtually every substantive issue from who was driving that evening to the witness' demeanor on the stand. In hindsight, trial counsel conceded that maybe he should have objected more often and appealed the denial of a mistrial. However, counsel was also quite clear in his reasoning for not taking these steps. As noted above, counsel was hesitant to object more often for fear that the jury would think he was attempting to hide something. Generally, the making or failure to make motions and objections are trial decisions within the discretion of trial counsel. *State v. Anderson*, 387 N.W.2d 544, 546 (S.D.1986); *State v. Tchida*, 347 N.W.2d 338, 339 (S.D.1984). His reason for not appealing the issue was that he believed he had "some other issues that were better." We decline to second-guess counsel's strategy and tactics regarding objections and issues for appeal. Trial counsel struggled throughout the trial with the State's penchant for leading his witnesses on direct-examination, even managing to have the court terminate the State's examination of Agent McConaghy because of leading questions. Petitioner fails to establish that counsel was not acting as counsel guaranteed by the Sixth Amendment. The habeas court is affirmed.

[¶ 69.] GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, and MILLER, Retired Justice, concur.

[¶ 70.] MILLER, Retired Justice, sitting for ZINTER, Justice, disqualified.